UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-10001-CR-MARTINEZ/SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JARRED ALEXANDER GOLDMAN,

        Defendant.

_____

### REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Mandate of the Eleventh Circuit Court of Appeals requiring the Court to conduct a restitution hearing to ascertain Defendant, Jarred Alexander Goldman's restitution amount (ECF No. 138 at 27), which was referred to United States Magistrate Judge, Lurana S. Snow, for a Report and Recommendation. The hearing was conducted on December 16, 2021, and this matter is ripe for consideration.

### I. PROCDURAL HISTORY

Defendant, Jarred Alexander Goldman and Co-Defendant Richard Steven Johnson were charged by Indictment with conspiracy to steal from a museum an object of cultural heritage and theft of a major artwork. (ECF No. 3) The charges arose from the theft of Gold Bar 27, a 17th century gold bar which had been on display at the Mel Fischer Maritime Heritage Museum in Key West, Florida ("the Museum"). Visitors to the Museum could physically handle the bar, which was part of the sunken treasure recovered from the wreck of the Spanish vessel Santa Margarita. This treasure, along with the treasure of the vessel Atocha, had been discovered and salvaged by Mel

Fischer. It is estimated that some 4 million people had handled Gold Bar 27 during the decades in which it had been on display, and the bar became the centerpiece of the Museum as well as the focal point of the Museum's promotional material.

The Defendant was convicted at trial, and this Court accepted the Museum's valuation of the bar in the amount of approximately $556,000.00, based on the testimony of Melissa Kendrick, the President and CEO of the Museum. Ms. Kendrick was not able to provide any details as to how the museum arrived at this valuation other than stating that a point system had been utilized. The Court rejected the insurance valuation of Gold Bar 27 of approximately $100,000.00, which had been based on a formula utilizing auction sales of similar bars, with a 15% increase for the bar's iconic value to the Museum. There is nothing in the record to reflect the basis for the determination that 15% was the appropriate enhancement figure. The Eleventh Circuit held that there was no basis in the record to ascertain whether the valuation method utilized by the Museum and accepted by this Court was reasonable.

The appellate court began by citing United States v. Shugart, 176 F. 3d 1373 11th Cir. 1999), which held that where fungible commodities are involved, the appropriate value for restitution purposes is "the actual cash value or fair market value, of the item – that is, [t]he fair or reasonable cash price for which the property could be sold in the market in the ordinary course of business.'" (ECF No. 138 at 21.) The court went on to note that where, as in the instant case, the loss involves a unique item or one for which no ready market exists, valuation for restitution purposes is replacement cost, "[t]he cost of a substitute asset that is equivalent to an asset currently held." Id. at 22 (quoting United States v. Steele, 897 F.3d 606, 610-11 (4th Cir. 2018)). And, in order to facilitate appellate review, the lower court must explain how it arrived at its loss figure. Id.

The Eleventh Circuit concluded that "allowing Kendrick to establish the gold bar's cash value, absent any evidence of her own training in valuating artifacts or any explanation of the Museum's point system, is not appropriate." Id. at 25. The Court pointed out that the record contained no explanation of the purpose of Museum's point system; why 8,178 points were assigned to Gold Bar 27; how the valuation of a single point is determined; how many points were assigned to comparable gold bars recovered at the same time from the same wrecks, and whether any comparable bars had been sold at auction and, if so, for how much. Id. at 26. The court also noted that while the insurance company's valuation method might be a more reliable one, this could not be determined without knowing the basis for the 15% increase for iconic value. Therefore, remand was required so that the missing information could be presented at a hearing. Id. at 26-27.

## II. HEARING EVIDENCE

The sole witness at the evidentiary hearing was Duncan Mathewson III, Ph.D., a historical site archaeologist. Dr. Mathewson has extensive field, teaching and valuation experience and has written four books about the Atocha.[1] Counsel for the Defendant stipulated to his expert credentials.

Dr. Mathewson had personal knowledge of Gold Bar 27 and its valuation. He explained that the point system was developed as a means for apportioning the marine salvage between the Treasure Salvors, Inc. (Fisher's company) and the State of Florida, and the system was ratified by the State in 1978. Dr. Mathewson confirmed the information contained in Defendant's Ex. 1 (ECF No. 142-1), a Summary Report of the Atocha 1985 Division Committee, which contains an introduction explaining how the

---

[1] Dr. Mathewson's detailed curriculum vitae was introduced in evidence as Government. Ex. 1, and a summary of his hearing testimony was introduced as Government Ex. 5.

point evaluation system was developed. The introduction states that in 1974, following the recovery of the Atocha treasure, the Division Committee was formed, consisting of four independent outside consultants, four experts representing Treasure Salvors, Inc. and eight knowledgeable agents of the State of Florida. The Committee devised the point system as a means of apportioning 25% of the salvaged items to the State and 75% to Treasure Salvors, Inc. Id. at 1.

Dr. Mathewson testified, and Defendant's Ex. 1 states, that the point system was ratified by United States District Judge William O. Mehrtens, who determined that $54.00 was the value of one point at that time, based on actual sales of the artifacts. This valuation was utilized by Judge Mehrtens to arrive at the amount of a supersedeas bond to be posted by the State in connection with an appeal. In 1981 and 1982, the Internal Revenue Service accepted $54.00 as the value of one point when valuing salvaged items that had been donated to museums and other non-profit organizations. Id.

The point value assigned to gold bars and discs was based on karat purity, clarity of markings and other numismatic criteria. The Summary Report explains how the Committee devised this valuation method:

> The Committee considered the marketing concepts, supply and demand, and did research on available materials. Part of the comparative analysis was based upon a study of "prices realized" from the highly publicized "Nanking Cargo" auction conducted in Amsterdam earlier this year by Christie's. This sale included the extremely rare Chinese gold bars that sold for as high as 20 times bullion value. At another phase of the comparative analysis, the Committee considered a later sale of a Spanish gold bar offered in London with no advance publicity and not as part of a collection, which realized a price just slightly above bullion value.

Id. at 9.

The Summary Report then details the method for determining the point value of the bars:

> The purity of the bar was divided by 24 (which is the highest purity possible). This purity then was multiplied by gram weight to determine the basic point value of the bar. This approximated five times bullion value. The Committee then added points to this value based on the following class factors:
>
> *1) -- the presence of karat stamps = 20 points for the first and 10 additional points for each additional karat stamp
>
> 2) -- clear tax stamp = 5 additional points. An excellent tax stamp = 10 additional points per stamp.
>
>   a) Illegible = 5 points
>   b) Sargosa = 25 points
>   c) Rada = 25 points
>   d) Vora = 50 points
>   e) Gdbs = 50 points
>   f) unusual foundry stamp = 100 points
>
> 4) -- Presence on the "Atocha Manifest" = 100 additional points.
>
> 5) -- Contraband bars (no markings) = 10 additional points
>
> * Stamps – imprint or impression on the bar.
>
> * Foundry – place or mine where bar was minted.[2]

Id.

Based on this point System, the Gold Bar Provenance Document (Government. Ex. 32), Gold Bar Artifact Card (ECF No. 31) pertaining to Gold Bar 27 and the list of gold bars found on the Santa Margarita (Government Ex. 30) reflect that the bar weighed 2,328 grams, had three karat stamps, one foundry mark and five partial seals. The bar was 281 centimeters long and 32 centimeters wide at the center, and had a karat value of 16.5. The assigned point value was 8,178 with a market value at the time of $441,612.00. These exhibits do not, however, reflect the number of points assigned for each characteristic of the bar in order to reach the 8,178 total. Dr.

---

[2] Defendant's Ex. 1 is not completely legible, so it is not possible to determine if there was a subheading "3." The undersigned believes that the point listings which follow subheading "2" may refer to various foundries.

Mathewson stated that the increase in value of the bar to approximately $556,000.00 is based on the increase in the value per point, which now is set at $68.00.

Dr. Mathewson testified that the United States Tax Court accepted this point system valuation method, when utilized to value a gold disc from the Atocha, which had been donated to a museum by Frank Perdue. <u>Franklinn P. Perdue v. Comm'r of Internal Revenue</u>, 62 T.C. M. (CCH) 845, T.C.M. P 91,478, 1991 TC Memo 91,478 (ECF No. 140-4). The IRS claimed the disc was valued at $74,000.00, while Dr. Mathewson set the value at $374,814.00. The Tax Court determined the disc's value to be $311,000.00, stating:

> An auction or museum shop buyer may give greater consideration to the romance of a Spanish galleon lost at sea hundreds of years ago. The auction or museum shop buyer pays a price based on certain facts known about the object. That is not a lack of knowledge; it is a different focus. We believe that the value of these Atocha artifacts, especially the gold disc, is enhanced by the romantic appeal and glamour. We believe that sales at the TSI Museum Shop and at auctions captures this element and are appropriately considered in deciding the value of these artifacts.

(ECF No. 140 at 8.)

Dr. Mathewson opined that the value of Gold Bar 27 should be much greater than $556,000.00, with a point value of up to $108.00 per point. He based this on the bar's public acclaim and recognition, noting that the bar was a prominent exhibit and established the Museum's brand. Museum visitors received a tag noting that they had handled the bar. For these reasons, the bar was irreplaceable. Dr. Mathewson pointed out that a 6th century Anglo Saxon helmet on display at the British Museum had increased in value from 50,000 pounds to 3 million pounds based on its prominence as a museum exhibit. Regarding the insurance valuation of Gold Bar 27, Dr. Mathewson explained that it was based on auction prices, which are essentially "fire sales." He emphasized that in an Amsterdam auction of Nanking treasure items, some gold bars sold for 20 times their auction estimates.

On cross-examination, Dr. Mathewson conceded that Perdue's gold disc was one of only seven recovered, the Nanking gold bars were exceedingly rare and the Anglo Saxon helmet was one of a kind. By contrast, more than 100 gold finger bars similar to Gold Bar 27 had been recovered by Fisher's team. He also acknowledged that the point system was devised before 1985, when Fischer discovered the "mother lode," from which most of the artifacts were recovered (arguably decreasing the value of each artifact). Finally, Dr. Mathewson admitted that the insurance valuation document (ECF No. 140-8) reflected that none of the gold bars from the Atocha had sold for six-figure amounts. However, Dr. Mathewson pointed out that none of these Atocha bars had been used as a museum exhibit. He also noted that the Perdue opinion ratified the point system several years after the discovery of the mother lode.

The only evidence presented relating to the insurance company's valuation of Gold Bar 27 is Government Ex. 3, a composite exhibit consisting of a letter to the Museum and a Sworn Statement in Proof of Loss. (ECF No. 140-8) The letter reflects that the applicable policy provided that the insurance company would not be liable for any amount above the "current market value," defined as "the price at which an asset would trade in a competitive auction setting." The letter explained that the company first computed the melt values of comparable gold bars sold at auction and subtracted those values from the auction sales prices of the bars. The resulting amount for each bar was deemed to be its value as a historical artifact. Auction sales prices for similar gold bars recovered from the Atocha indicated that the bars sold for 45% above the melt value. An additional 15% was added for Gold Bar 27's iconic value, but the letter does not explain how the company arrived at this figure. The final market value of Gold Bar 27 was computed as $101,165.01. Id. at 4.

### III. DISCUSSION

Based on the testimony presented at the hearing, the undersigned finds that the Museum's valuation figure should be accepted. The Summary Report of the Division Committee (ECF No. 140-1) generally explains how points were assigned, and this methodology, as well as the $54.00 per point established initially, were ratified by the State of Florida, by United States District Judge William O. Mehtrens when setting a supersedeas bond, by the IRS and by the United States Tax Court in Perdue. The increase in the valuation of Gold Bar 27 from the original amount of $441,612.00 is the result of an increase in the value per point to $68.00, a reasonable increase after more than three decades.

By contrast, the insurance company's valuation is based on market value, not on replacement value, as mandated by the Eleventh Circuit. Moreover, there is no evidence as to how the insurance company arrived at the figure of 15% to account for Gold Bar 27's iconic value. Dr. Mathewson, a renowned expert in marine archaeology, testified that because Gold Bar 27 essentially was irreplaceable, approximately $556,000.00 valuation, which was based solely on the point system, was far too low. The undersigned concurs, and finds that the minimum replacement value of Gold Bar 27 for restitution purposes should be $556,106.00 (8178 points x $68.00), the amount initially requested by the Museum and accepted by this Court.

### IV. CONCLUSION

This Court having considered carefully the papers, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the base restitution amount be set at $556,106.00.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any,

with the Honorable Jose E. Martinez, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1..

DONE AND SUBMITTED at Key West, Florida, this 19th day of January, 2022.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record